David Hilton Wise, Esq. (NV S.B. #11014)
**WISE LAW FIRM, PLC**
335 W. 1st Street
Reno, Nevada 89503
Telephone: (775) 299-4284
Email: dwise@wiselaw.pro

Alexandra M. Honeycutt*
**MILBERG PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
ahoneycutt@milberg.com

Alexandra Mormile*
**SHAMIS GENTILE, P.A.**
14 NE 1st Ave Suite 705
Miami, FL 33132
Tel: 305.479.2299
E: amormile@shamisgentile.com

* *pro hac vice forthcoming*

Counsel for Plaintiff and the Putative Class

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| R.L., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN ADDICTION CENTERS, INC.<br><br>Defendant. | Case No. 3:26-cv-714<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Robert Levendusky ("Plaintiff"), at all relevant times herein, was a user of American Addiction Centers, Inc.'s ("AAC" or "Defendant") website and used Defendant's website to schedule appointments, fill out forms, and request information. Plaintiff brings this class

action lawsuit against Defendant in his individual capacity and on behalf of all others similarly situated. Upon his personal knowledge as to his own actions, upon his counsel's investigation, and upon information and belief as to all other matters, Plaintiff alleges as follows:

1. Plaintiff brings this class action lawsuit on behalf of a nationwide class to address Defendant's outrageous, illegal, and widespread practice of collecting, disclosing, and monetizing Plaintiff's and Class Members' confidential personally identifiable information ("PII"), confidential health communications ("CMC"), and protected health information ("PHI") (collectively referred to as "Private Information") to unauthorized third parties, including Google LLC ("Google"), without consent, through the use of tracking software that was implemented, configured and embedded in Defendant's Website.

2. Defendant provides residential, outpatient, and aftercare addiction treatment services, including treatment for substance use disorder and co-occurring mental health issues. Defendant operates the website https://americanaddictioncenters.org/ and associated subpages ("Defendant's Website," the "Website", or "AAC's Website"). Defendant operates addiction treatment facilities nationwide, including in California, Florida, Texas, Nevada, Massachusetts, Mississippi, New Jersey, and Rhode Island. Defendant holds its Website out to the public, including to Plaintiff and Class Members, as a method of marketing its addiction treatment services and offering prospective patients access to a variety of online services.

3. Defendant is a HIPAA-covered healthcare entity, and thus its disclosure and use of Private Medical Information for marketing is tightly regulated. The United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how healthcare providers must safeguard and protect Private Information. Under the Health Insurance Portability

and Accountability Act of 1996 ("HIPAA") Privacy Rule, no healthcare provider can disclose a person's personally identifiable PHI to a third party without express written authorization.

4. In addition to being a HIPAA-covered entity, AAC is subject to heightened confidentiality obligations pursuant to the Code of Federal Regulations ("CFR"), 42 U.S.C. § 290dd-2, which protects the confidentiality associated with "the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance use disorder education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States." 42 U.S.C. § 290dd-2(a). In fact, AAC's website addresses both HIPAA and the CFR federal mandates, which applies to their patients.[1]

5. Defendant encourages its patients and prospective patients, including Plaintiff and Class Members, to utilize the Website as a confidential means of researching addiction treatment programs, locations, scheduling appointments, completing admissions and other forms, requesting information, and verifying whether treatment may be covered by their health insurance.

6. In doing so, and by designing its Website in the manner described throughout this Complaint, Defendant knew or should have known that its patients and prospective patients would use the Website in conjunction with obtaining and receiving addiction treatment and rehabilitation services from it.

7. Plaintiff and Class Members had a reasonable expectation of privacy when utilizing the Website for addiction treatment services including but not limited to, researching specific treatment programs, scheduling appointments, completing forms, and requesting information.

[1] https://americanaddictioncenters.org/rehab-guide/confidentiality-hipaa (last accessed Sept. 3, 2026)

8. Plaintiff and other Class Members who used Defendant's Website reasonably believed they were communicating only with their trusted addiction treatment provider, and nothing about the Website's appearance indicated that the unauthorized third parties could intercept and obtain Private Information submitted by its users.

9. Despite the above and unbeknownst to Plaintiff and Class Members, Defendant embedded tracking tools on its Website that surreptitiously track and transmit Plaintiff's and Class Members' online activity and communications (including intimate details about their treatments, healthcare, and rehabilitation) to Google and other third-party tracking technologies without first obtaining their permission, in violation of the patients and website users' reasonable expectations of privacy, HIPAA, the CFR, state and federal laws, industry standards, and patient expectations. As used herein, the term "Tracking Tools" includes (1) Google Analytics, (2) the Google Tag Manager, and (3) similar tools offered by Google in conjunction with its marketing products and other platforms (such as "DoubleClick" and Google Ad Remarketing).

10. Defendant used Tracking Tools to divulge Private Information from users of its Website, like Plaintiff, for marketing, re-marketing, and analytics purposes, despite its express promises that users could contact AAC in "confidential, free, and no obligation ways," that their "information is secure & protected by HIPAA," and that "Everything is 100% confidential."[2]

11. Although Plaintiff is presently unaware of every type of pixel and tracking tool that Defendant deployed during the relevant time period, "Tracking Tools" also refers to any

[2] *About Us*, American Addiction Centers, https://americanaddictioncenters.org/about-us (last visited Sept. 3, 2026); *Contact Us*, American Addiction Centers, https://americanaddictioncenters.org/contact-us (last visited Sept. 3, 2026); *Verify Your Rehab Coverage Instantly*, American Addiction Centers, https://americanaddictioncenters.org/verify-insurance (last visited Sept. 3, 2026); *Drug & Alcohol Rehab Application Form*, American Addiction Centers, https://americanaddictioncenters.org/rehab-application-form (last visited Sept. 3, 2026).

technology that divulges confidential information to an unauthorized third-party: (1) that has not executed a HIPAA-compliant business associate agreement with Defendant; and (2) for which patients did not execute a HIPAA-compliant marketing authorization.

12. Indeed, the Tracking Tools' specific purpose is to provide website owners with the ability to acquire the raw web user data and to then transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. The Tracking Tools are offered for "free" to companies like Defendant but require the website owner to share and disclose web users' valuable behavioral web browsing data with unauthorized third-party marketers.

13. Google makes a profit by capturing and sharing web user data. Google's online advertising business generated 42.4 percent of global digital ad revenue in 2023.[3]

14. With the intent to monetize the patient information flowing through its Website, Defendant installed Tracking Tools from Google onto its Website, which provided Defendant with valuable marketing tools to create more efficient and profitable marketing campaigns.

15. Moreover, by installing Google Analytics and other Tracking Tools on its Website, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers that caused their communications to be intercepted, accessed, viewed, and captured by Google in real time, as they were communicated by patients, based on Defendant's chosen parameters.

16. The Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies, such as the Tracking Tools. The Bulletin expressly provides (in bold type) that

---

[3] Thomas Eger & Marc Scheufen, *Google's Online Advertising Business Generated 42.4 Percent of Global Digital Ad Revenue In 2023*, EUROPEAN J. L. & ECON., Mar. 4, 2024, at 101 n.29, https://link.springer.com/article/10.1007/s10657-024-09796-x? (last visited Sept. 3, 2026).

**"[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."[4]** In other words, HHS has expressly stated that Defendant's implementation of the Tracking Tools violates HIPAA Rules.[5]

17. The information Defendant divulged to Google allowed Google to learn that specific individuals were patients or prospective patients seeking and addiction treatment from Defendant's facilities.

18. Patients simply do not anticipate that their trusted addiction or rehabilitation treatment provider will send their PHI or confidential medical and health information to social media and marketing companies for future exploitation and targeted marketing. On the same note, neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant

---

[4] See *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Sept. 3, 2026).

[5] This guidance was recently vacated in part by the Federal District Court for the Northern District of Texas due to the court finding it in part to be the product of improper rulemaking and it is cited for reference only until the OCR updates its guidance, should it do so in the future. *See Am. Hosp. Ass'n. v. Becerra*, No. 4:23-cv-01110-P, ECF No. 67 (S.D. Tex., June. 20, 2024). Notably, the court's order found only that the OCR's guidance regarding covered entities disclosing to third parties users' IP addresses while users navigated unauthenticated public webpages ("UPWs") was improper rulemaking. The Order in no way affects or undermines the OCR's guidance regarding covered entities disclosing personal identifiers, such as Google or Facebook identifiers, to third parties while patients were making appointments for particular conditions, paying medical bills or logging into (or using) a patient portal. *See id.* at 3-4, 31, n. 8 (vacating the OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document."). Furthermore, the FTC bulletin on the same topics remains untouched, as do the FTC's enforcement actions against health care providers for committing the same actions alleged herein.

to send their Private Information to Google. Similarly, Defendant does not have a HIPAA-compliant Business Associate Agreement in place with Google.

19. In response to the use of tracking technologies by HIPAA covered entities, like Defendant, the recently issued HHS Bulletin warns that:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [6]

20. Consequently, Plaintiff brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin Defendant from making similar disclosure of its patients' Private Information in the future, and to fully articulate, *inter alia*, the specific Private Information it disclosed to third parties and to identify the recipients of that information.

21. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including invasion of privacy, loss of benefit of the bargain, diminution of value of the Private Information, emotional distress, statutory damages, and the continued and ongoing risk to their Private Information.

[6] U.S. DEP'T OF HEALTH & HUMAN SERVS., *supra* note 3.

22. Plaintiff seeks to remedy these harms and brings causes of action for (1) violations of the Electronic Communications Privacy Act ("ECPA") 18 U.S.C. §§ 2511(1), *et seq.*; (2) the Florida Security of Communications Act ("FSCA"); (3) invasion of privacy; (4) negligence; (5) breach of confidence; (6) breach of implied contract; and (7) unjust enrichment.

## PARTIES

23. Defendant American Addiction Centers, Inc. ("AAC" or "Defendant") is a Nevada corporation and a leading provider for addiction treatment nationwide, offering residential, outpatient, and aftercare programs in California, Florida, Texas, Nevada, Massachusetts, Mississippi, New Jersey, and Rhode Island. Defendant's principal place of business is located at 500 Wilson Pike Cir Ste 360, Brentwood, Tennessee 37027. As relevant to this Complaint, in addition to operating its addiction treatment facilities, Defendant's services include operating the Website.

24. AAC designs and maintains, and/or directs the design and maintenance, of the Website from its offices. This conduct includes the decisions on whether and how to embed Google Analytics, Google Ads, Google Tag Manager, and other Tracking Tools on the Website, whether to maintain the Tracking Tools, and how to exploit the data and analytics services received from Google based on patients' and website users' PHI and PII.

25. Plaintiff R.L. is an individual residing in Florida where he intends to remain. He is an AAC patient who last used the Website in August 2026.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Class Members, and

minimal diversity exists because Plaintiff and many putative Class Members are citizens of a different state than Defendant.

27. This is a class action brought pursuant to Federal Rules of Civil Procedure 23. The damages sought exceed the amount-in-controversy requirement of CAFA and will be established at trial.

28. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.,* and 18 U.S.C. § 2702).

29. This Court has personal jurisdiction over Defendant because Defendant is incorporated in the State of Nevada and has otherwise made or established contacts in the State of Nevada and in this judicial district sufficient to permit the exercise of personal jurisdiction.

30. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)-(2) because Defendant resides in this judicial district, and/or because a substantial part of the events giving rise to the claim occurred in this judicial district.

## COMMON FACTUAL ALLEGATIONS

### A. Underlying Web Tracking Tools & Communications.

31. To understand Defendant's unlawful data-sharing and misuse practices, it is important first to understand the basics of computer science and online communications.

32. Devices (such as computers, tablets, or smart phones) access web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge Browser).

33. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

34. Every website is comprised of markup and source code. Markup is the forward-facing portion of the website that the visitor sees and interacts with, such as images, links, forms, and more. By contrast, source code is essentially the invisible back-end portion of the website. The website user does not see what is happening within the source code during an ordinary website visit, but the source code acts as the set of instructions that commands the website visitor's browser and causes it to take certain actions when the web page first loads or when a specified event triggers the code. The source code is the mechanism that controls how a website user's browser communicates with the website's server, and vice versa.

35. As a user interacts with a website, multiple forms of web communications are occurring in the background between the user's browser and the website's server and include, but are not limited to:

- **HTTP Requests** are electronic communications sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests (e.g., request to access a page). POST Requests are requests to send data to the server (e.g., Form Submissions);

- **HTTP Responses** are electronic communications sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of a file, text information, or error codes, among other data;[7]

- **Uniform Resource Locators ("URL")** are web addresses that contain details of the HTTP Request and the user's specific search and browsing activities;

- **Cookies** are small text files that are set by the website the user is visiting and establish lines of communication between the user's browser and the website server. First Party Cookies are used to store information on the client device which can later be communicated to a server or servers such as user preferences (e.g., remember log in info). Users cannot detect or prevent transmissions through first-party cookies. Third-Party Cookies are set by a third-party domain such as Google and are used for targeted marketing purposes. Third-Party cookies can track the user across the web as the user searches and visits other websites.

---

[7] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

36. A website owner, if motivated, can manipulate the HTTP Request process and allow third party access to the user-server web communication. This interference is typically done through Tracking Technology with the intent to gather data from the user's website behavior for monetization and various marketing purposes.

37. Tracking Technology is implemented on a website by secretly embedding and configuring the tracking software into the Source Code. Once the Tracking Technology is implemented and configured in the Source Code, the Tracking Technology automatically intervenes and manipulates the HTTP web communication between the user's browser and the website server and instructs the website to send a duplicate transmission of the communication to unauthorized third-party servers, i.e., Google.

38. Here, without its patients' consent, Defendant effectively used its Source Code to commandeer and "bug" or "tap" its patients' computing devices, allowing Google to listen in on all of their communications with Defendant and thereby intercept those communications, including PHI and PII.

**B. Defendant Collected & Disclosed Plaintiff's and Class Members' Private Information to Google Through the Use of Google Tracking Tools.**

39. Google offers tracking tools to entities like Defendant for "free." However, access to the Google tracking tools is also bartered in exchange for Defendant's patients' PHI. By implementing and configuring Google Analytics, Defendant caused Plaintiff's and Class Members' communications to be intercepted by and/or disclosed to Google.

40. Defendant's Source Code implemented with Google Analytics (G-TSK9NK9GK3), Google Tag Manager (GTM-TZPWMT) and Google Ads Remarketing (AW-

1071474328) manipulated the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Google.[8]

41. Google Analytics is marginally different than other Tracking Tools but essentially accomplishes the same goal: tracking what a user communicates to Defendant's Website.[9] Google Analytics records the exact page and title; and Google Ads can fire three conversion trackers marking the user as a potential patient. These transmissions also occurred contemporaneously, invisibly, and without the patient's knowledge.

42. Several different methods allow marketers and third parties to identify individual website users, but the examples below demonstrate what happens when the website user is logged into their Google account on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Tracking Tools. For example, the Tracking Tools transmit the user's CID, thereby allowing Google to link the user's online communications and interactions to their Google Account.

43. Google receives at least five cookies when Defendant's Website transmits information via Google Analytics:

**Request Cookies** ☐ show filtered out request cookies

| Name | Value | Domain | P... | Expir... | Size | Htt... | Se... | Sa... | Par... | Cr... | Pri... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| __Secure-3PSIDTS | sidts-CjIBXMw41YR... | .google.com | / | 202... | 94 | ✓ | ✓ | No... | | | High |
| __Secure-3PSID | g.a000BAnLuzrb4K... | .google.com | / | 202... | 167 | ✓ | ✓ | No... | | | High |
| __Secure-3PAPISID | M54-_D9WzuDF3Je... | .google.com | / | 202... | 51 | | ✓ | No... | | | High |
| __Secure-3PSIDCC | AKEyXzW7n5GW6n... | .google.com | / | 202... | 91 | ✓ | ✓ | No... | | | High |
| NID | 534=g1qK4RloniQDl... | .google.com | / | 202... | 1066 | ✓ | ✓ | No... | | | Me... |

*Figure 1. Screenshot from Defendant's network traffic report for Google Analytics list of cookies sent out.*

[8]

[9] Amrita Singh, *Comparing Google Analytics vs Facebook Pixel*, BOLTIC (Nov. 17, 2022), https://www.boltic.io/blog/google-analytics-vs-facebook-pixel (last visited Sept. 3, 2026).

44. The NID cookie contains an encrypted Google Account ID and browser identifier. Google, at a minimum, uses the NID cookie to identify users, and this particular cookie can stay on a user's website browser for up to 6 months to identify the user's history on the website.[10]

45. The cookies listed in Figure 1 above are third-party cookies because they were created by Google and not Defendant. Although Google created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Google would not have received this data but for Defendant's implementation and use of the Tracking Tools throughout its Website.

46. Defendant also revealed its website visitors' identities via first-party cookies such as the _ga cookie that google uses to identify a particular browser and a user.




*Figure 2. Screenshot from Defendant's network depicting the first party cookie _ga.*

47. Importantly, the _ga cookie is transmitted to Google even when the user's browser is configured to block third-party tracking cookies because, unlike the NID and CID cookies, the _ga cookie functions as a first party cookie"—i.e., a cookie that was created and placed on the website by Defendant.[11]

48. In summation, Google at a minimum, uses the NID, _ga, and CID cookies to link website visitors' communications and online activity with their corresponding Google Accounts, and because the tracking tools are automatically programmed to transmit data via both first-party

---

[10] *How Google Uses Cookies*, GOOGLE PRIV. & TERMS, https://policies.google.com/technologies/cookies?hl=en-US (last visited Sept. 3, 2026).

[11] *Id.*

and third-party cookies, patients' information and identities are revealed to Google even when they have disabled third-party cookies within their web browsers.

49. As the user navigates the Website, Google Analytics sends a special "file download" event to its servers containing: (1) exact file name; (2) the full URL to the form; (3) time on the page before downloading; and (4) assigns a permanent tracking ID linking the user to all previous visits.

50. As a direct result, Defendant disclosed confidential communications and PHI to Google in the forms of page views and events relating to the past, present, and future medical care of Plaintiff and Class Members. Without discovery, Plaintiff is unable to know the precise configuration in the Google Tag Manager Container or to determine precisely what form content and fields may also have been disclosed.

51. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, and events each (1) related to the past, present and future medical care of Plaintiff and Class Members, (2) conferred and indicated that the user (Plaintiff and Class Members) was a patient or prospective patient at the time of the tracked web activity and (3), as discussed below, the behavioral data is identifiable with a specific user through the identifiers that were also disclosed to Google at the same time.

52. Each of these web communications was disclosed without Plaintiff's or Class Members' express written consent and without a HIPAA-compliant business associate agreement governing the transfer of data between Defendant and Google or any downstream parties.

53. Google collected vast quantities of Plaintiff's and Class Members' Private Information via the Tracking Tools installed on Defendant's Website.

**C. Other Digital Identifiers (IP Addresses)**

54. The baseline configurations of Google's Tracking Tools also collected and disclosed extensive amounts of additional user data that can be used to identify the specific user, including, but not limited to: the user's IP address, type of device, and operating system.

55. On information and belief, through the use of the Tracking Tools on Defendant's Website, Defendant also disclosed and otherwise assisted Google with intercepting Plaintiff's and Class Members' IP addresses.

56. An IP address is a number that identifies the address of a device connected to the Internet.

57. IP addresses are used to identify and route communications on the Internet.

58. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

59. As to Google, whenever a user visits a website that is running Google Analytics and Google Ad Manager, Google's software scripts on the website surreptitiously direct the user's browser to send a secret, separate message to Google's servers in California, which includes the user's IP address, the user's geolocation, information contained in Google cookies, any user-ID issued by the website to the user, and information about the browser the user is using.

60. Defendant does not appear to have enabled the IP anonymization feature provided by Google Analytics because the text "aip:" does not appear anywhere in the source code.

**D. Web User's Journey on the Website.**

61. To add additional detail to the allegations, the following paragraphs will walk through the process of what Plaintiff and Class members would experience when utilizing the Website, as well as showing what was happening secretly in the Source Code surveilling their activity.

### *1. AAC's Homepage*

62. When patients entered the homepage of the site, they entered a secretive digital world that was surveilling each movement and each decision they made on the site, as reflected in the image below.




*Figure 3. Screenshot of network traffic taken from Defendant's Website which shows that the Tracking Tools are actively installed and firing on Defendant's Homepage.*

63. As depicted in Figure 3, immediately upon entering the homepage, Google's Tracking Tools are firing to capture, *inter alia*, the user's visit and page views, so Defendant and Google can reissue targeted advertisements to that particular user.

### *2. View Locations*

64. Upon entering the Website, a user can select one of Defendant's eighteen locations for treatment using the "Our Locations" tab at the top of the Website's homepage. When the user clicks that tab, they are brought to a page which lists the various locations and provides the user with options on where to seek treatment or rehabilitation. Unbeknownst to the user, as they searched for where to receive their confidential medical and substance abuse treatment on the

Website, they simultaneously entered a secretive digital world that was surveilling each movement and decision they made on the site, as reflected below.

65. In the below example, the user clicked "View Treatment Center" under Recovery First Treatment Center: Hollywood, Florida example.




*Figure 4. Screenshot showing network traffic on right side on Hollywood, Florida location page.*

66. Upon visiting this location page, and all location pages, the user's browser sends an HTTP Request to Defendant's server and Google. Defendant's web server then automatically returns an HTTP Response, which loads the Markup for that particular webpage. Similarly, the user only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses operating behind the curtain of the Website. Google is now informed that the patient is seeking substance abuse treatment and where that user is seeking treatment.

67. On this page, the user also can see if their insurance will be accepted at the facility through filling out the form at the link to "Check Coverage Online." However, when the user begins to fill out the form, Google is automatically informed that the user has started the form and

has intercepted the confidential information the user input in the form, which includes *inter alia*, their name, policy name, and policy number.




*Figure 5. Screenshot of network traffic taken from Defendant's website, wherein the patient has clicked on the "Check Coverage" tab for the Hollywood, Florida location. The right-side of the screenshot evidences that the Google Analytics was alerted when the user began filling out information on the form. The left side of the screenshot shows the form itself.*

68. In addition, several cookies are triggered when the user fills out the form alerting both Google that the user is seeking treatment at this particular location.




*Figure 6. Screenshot of network traffic taken from Defendant's Website, showing 5 cookie requests on the right side being sent to Google while the user inputs their sensitive and confidential insurance information into the Check Your Coverage tool.*

69. As this scenario plays out with thousands of users searching for and communicating about their substance abuse issues and inquiries about rehabilitation or treatment at one of Defendant's specific locations on the Website, the data collected from Google's Tracking Tools are then linked to both Google's organization and monetization. Through these tools, Defendant had access to sophisticated data analytics reports that can be utilized for website optimization, profile building, and advertising campaign optimization.

***3. Researching Treatments***

70. The Website also allows users to research various treatments or procedures that Defendant provides, by clicking on the "Treatment" tab on the of the Website's homepage. Subsequently, the user is able toggle through the subtabs and click on specific levels of care, treatment processes, length of stay and specialized treatment options. In this example, the user researched "Medication-Assisted Treatment for Addiction" through the drop down list of treatment options.

71. However, if a user navigates to a page about a treatment, like Medication-Assisted Treatment for Addiction, whatever they are viewing is communicated to Google via cookies and Request URLs.




*Figure 7. The left side of the Figure 7 is a screenshot from Defendant's Website wherein the patient the has clicked on the "Medication-Assisted Treatment for Addiction" page via subtabs on the "Procedures" tab on the top of the Website's homepage. The right side of Figure 7 is a screenshot of network traffic taken from Defendant's website which display that the Tracking Tools simultaneously transmitted the above-mentioned communication to Google.*

72. When the user clicks this page, Google is once again sent five cookies triggered by the page view, as well as a Request URL which specifically indicates the user is researching Medication-Assisted Treatment for Addiction. This will alert Google to the different kinds of medicine the user is taking or interested in taking, and that the user has or may have a substance abuse disorder.

### 3. *Using the Search Bar*

73. In addition, whilst navigating the website, the user also has the option of using the search bar to search different treatments and rehabilitations AAC offers. In the below example, the user searched "opiod addiction." Upon searching, the exact text of that search was sent to Google through Google Analytics, thus alerting a third party about the user's substance abuse disorder.



*Figure 8. The left side of the Figure 8 is a screenshot from Defendant's website wherein the patient the has "opiod addiction" and landed on the results page for that particular search. The right side of Figure 8 is a screenshot of network traffic taken from Defendant's website which display that the Tracking Tools simultaneously transmitted the above-mentioned communication to Google containing the exact text of the user's confidential search.*

74. As depicted above, the unauthorized transmission of the patients' interactions with Defendant's website is highly offensive to the reasonable person, as their browsing history is directly linked to their confidential PHI, and that browsing history is undoubtedly being shared with Google.

**G. Plaintiff's and Class Members' Private Information was Viewed and Used by Unauthorized Third Parties.**

75. The Google Tracking Tools do not work in isolation. Instead, they connect a web user's browsing activity directly to the powerful Google advertising ecosystem, including Google Ads and Google's display network. They offer highly valuable and effective integration between the data collected on a website and advertising campaigns through Google's platforms.

76. After intercepting and collecting the Private Information, Google processes and analyzes the data and may associate it with identifiers linked to a user's Google account. Google

uses the collected information to improve its ad targeting capabilities, machine learning and AI models, products and services, and data collections on users.

77. In addition to the Website analytics, Google provides reports concerning acquisition, engagement, and demographics and uses data collected through Google Analytics and other Tracking Tools to promote targeted ads on Google.com, YouTube, and across Google's display network.

78. Google's Tracking Tools provide information about website users' interactions, including the pages they visit, the links they click, and the information they enter into text fields. The data may be used to identify and target individual users through Google-specific identifiers and IP addresses.

79. Google's systems use the data provided through its Tracking Tools to learn and predict which users are more likely to respond to advertisements and to deliver targeted advertisements. As a result, individuals whose data is disclosed by one entity may see advertisements for other entities through Google's advertising system.

80. Defendant is in exclusive control over whether Google Tracking Tools were implemented and configured on the Website, including which webpages contain the tools, what information is tracked and transmitted, and how events are categorized before transmission. The presence of targeted advertisements after a Website visit indicates that the data collected through the Website was used for advertising purposes.

81. At a minimum, Defendant disclosed sufficient Private Information from which Google could infer Plaintiff's and Class Members' status as patients or prospective patients.

### H. Defendant Was Enriched and Benefited from the Use of the Tracking Tools and Plaintiff's Private Information Had Financial Value.

82. The Tracking Tools served the sole purpose of bolstering Defendant's profits via marketing and advertising.

83. In exchange for bartering away and disclosing the Private Information of its patients, Defendant is compensated by Google and the like in the form of enhanced advertising services and more cost-efficient marketing on its Website and Online Platforms.

84. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

85. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

86. Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil."[12] Defendant's disclosure of Private Information harmed Plaintiff and the Class. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is expected to continue to increase, and estimates for 2022 are as high as $434 per user, constituting over $200 billion industry-wide.[13]

87. The value of health data is particularly well-known and has been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How

---

[12] *See, e.g.*, Vahid, *Data Is the New Oil: A Powerful Metaphor with a Catch*, MEDIUM (May 23, 2026), https://medium.com/@vhid/data-is-the-new-oil-a-powerful-metaphor-with-a-catch-35899859bcb6 (last visited Sept. 3, 2026).

[13] *See* Robert J. Shapiro, *What Your Data Is Really Worth to Facebook*, WASHINGTON MONTHLY (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/.

Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[14]

88. Moreover, healthcare systems commonly value the lifetime value of a patient and the value of a marketing lead and impression, as well as the value of the conversion of a new patient.

89. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other healthcare organizations and sell it to buyers."[15] Accordingly, patient data that can be linked to a specific individual is even more valuable.

90. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[16]

91. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the

---

[14] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME.COM (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited Sept. 3, 2026).

[15] *See* Christina Farr, *Hospital Execs Say They Are Getting Flooded With Requests For Your Health Data*, CNBC, https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Sept. 3, 2026).

[16] VERO, *How to Collect Emails Addresses on Twitter*, https://www.getvero.com/resources/twitter-lead-generation-cards/ (last visited Sept. 3, 2026).

Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

92. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

93. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[17]

94. Data brokers obtain large volumes of consumer information without consumer knowledge to resell the data for marketing campaigns. The FTC has investigated the practices and found that "data brokers collect and store billions of data elements covering nearly every U.S. consumer."[18]

95. Data brokers combine online and offline data to market to consumers online. Data brokers combine and analyze data about consumers to make inferences about them, including sensitive inferences related to health conditions. Some data brokers have been found to store data indefinitely, posing significant privacy risks.[19]

---

[17] *Hackers, Breaches, and the Value of Healthcare Data,* IMPRIVIATA (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers.

[18] *FTC Recommends Congress Require the Data Broker Industry to be More Transparent and Give Consumers Greater Control Over Their Personal Information*, FTC (May 27, 2014), https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-recommends-congress-require-data-broker-industry-be-more-transparent-give-consumers-greater.

[19] *Id*.

96. Data brokers do not obtain the data directly from consumers; rather, they obtain it through various sources, including partnerships with third party marketers that utilize tracking tools. While each data broker source may provide only a few data elements about a consumer's activities, a data broker can combine the data sets to form a more detailed profile of the consumer's life.

97. In fact, the unauthorized data collection from third party trackers, tags, and pixels has resulted in a proliferation and expansion of the data broker ecosystem. The web trackers serve as pivotal components in the data broker ecosystem by facilitating the collection of online activities, preferences, and demographics. This aggregated data is then analyzed and sold to various entities interested in understanding consumer behavior and targeting specific demographics.[20]

98. The U.S. data broker market is projected to grow from $280.82 billion in 2023 to $382.16 billion in 2030. This expansion is largely driven by data harvested from pixels and trackers—like those embedded on the Website.

99. As far as medical advertising, the data brokers routinely utilize the data sets to predict which consumers are most likely to use, e.g., brand name medicine, order prescriptions by mail, research medications online, or respond to pharmaceutical ads or other treatment advertisements. These predictive models are then sold and used for targeted advertising.

100. The lack of transparency in the data brokering ecosystem makes it unknown whether Google sold or traded any of the data they received through the Tracking Tools.

---

[20] Online Data Privacy Report: Website Privacy and Compliance Challenges (Mar. 2024), https://lokker.com/api/directus-assets/419fdf43-83ba-4dba-9821-d8eff94f956a (last visited Sept. 3, 2026)

101. However, it is indisputable that the data at issue, given its medical data, is highly valuable for segmentation and profile building.

102. Once the data is shared and disclosed to Google, the patients, Class Members, and Defendant lose control over its usage and distribution.

**I. Defendant's Disclosure of Private Health Information to Google Violated HIPAA Regulations and Industry Standards.**

103. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI, and it sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

104. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d to 1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

105. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[21]

---

[21] *The HIPAA Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Sept. 3, 2026).

106. The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

107. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that: (1) "[i]s created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

108. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

(a) Names;
***
(h) Medical record numbers;
***
(j) Account numbers;
***
(m) Device identifiers and serial numbers;

(n) Web Universal Resource Locators (URLs);

(o) Internet Protocol (IP) address numbers; … and

> (r) Any other unique identifying number, characteristic, or code … ; and"
>
> The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514(b)(2)

109. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data . . . . If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[22]

110. In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added). [23]

---

[22] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance With the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS (Nov. 26, 2012), available at https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[23] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Sept. 3, 2026).

111. Here, Defendant effectively traded its patient list for access to these valuable marketing tools. And neither Plaintiff nor any Class Member provided express written consent for the use of their PHI for marketing purposes.

112. While there was not a direct sale of the patient list, by disclosing the patient status of all the users of the Website in exchange for valuable marketing tools, Defendant engaged in a bartered commercial transaction whereby its patient list was constructively and effectively sold to the world's largest marketing companies.

113. The Tracking Tools allow advertisers to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.

114. Defendant utilized the Tracking Tools on numerous sensitive pages of its Website with the intent to share and disclose Plaintiff's and Class Members' confidential web communications and behavioral data with Google.

115. Whether done intentionally, recklessly, or negligently, the data shared with Google was PHI.

116. Upon information and belief, Defendant utilized the Tracking Tools and shared PHI with Google with the intent to maximize its marketing return on investment.

117. Upon information and belief, Defendant accessed and utilized Google Analytics and Google Ads reports to review and utilize the Google Tracking Tools data to refine and design its advertising strategies. These strategies were intended to monetize Plaintiff's and Class Members' data and included one or more of the following: website analytics, advertising optimization, conversion tracking, and/or email marketing.

118. While Plaintiff does not assert a private right of action under HIPAA, the intentional violations of the statutory duties and standards under HIPAA constitute criminal and civil acts subject to penalties imposed by 42 U.S.C. § 1320d-6.

119. Here, Defendant knowingly implemented Tracking Tools with the intent of collecting and disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b).

120. The primary motivation and a determining factor in Defendant's collection, interception, and disclosure of Plaintiff's and Class Members' Private Information was the use of patient data for advertising in the absence of express written consent. Such conduct gives rise to a violation of HIPAA.

121. Moreover, there is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320d-6(b)(3).

122. Moreover, as seen above**,** Defendant also disclosed and otherwise assisted Google with intercepting Plaintiff's and Class Members' computer IP addresses.

123. Under HIPAA, an IP address is considered personally identifiable information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).
- HIPAA further declares information as personally identifiable where the covered

entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

124. Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

**E. Defendant's Marketing Conduct Also Violated Florida Law**

125. Florida law has established policies and procedures for the maintenance, preservation, and storage of patient medical records.

126. All patient records "are confidential." Fla. Stat. § 395.3025(4). In addition, "Florida law recognizes the confidentiality of a patient's medical record pursuant to the Right of Privacy clause, contained in Article I, Section 23 of the Florida Constitution."

127. Further, the Florida Patient's Bill of Rights provides that "Every patient who is provided health care services retains certain rights to privacy, which must be respected without regard to the patient's economic status or source of payment for his or her care."

128. Finally, Florida Statutes § 934.10 provides, in pertinent part, as follows:

> Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,0000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

129. Indeed, Defendant willingly facilitated Google's interception and collection of Plaintiffs' and Class Members' Private Information by embedding the Tracking Tools on its Website.

130. As described herein, Defendant used the Tracking Tools and variety of other items as devices or apparatus to intercept wire, electronic, or oral communications made by Plaintiff and other Class Members.

131. Accordingly, Defendant's actions described herein violated Florida law.

**J. Defendant's Privacy Policy and Cookie Banner are Insufficient to Obtain the Patient's Consent**

132. Defendant maintains a Privacy Policy hidden at the bottom of their homepage which has not been updated since January 2024.[24] The Privacy Policy provides the user with a long-winded way to opt out of cookies, but explicitly say that does not opt the user out of all cookies, and the user will need to reconfigure their browser to do so.[25]

133. In addition, the user is also greeted with a cookie banner which is wholly insufficient to obtain the user's consent to Tracking Tools for several reasons. *First*, the cookie banner is permissive, in that the user is fully allowed to interact with the site before ever accepting or rejecting the cookies on the site. Put simply, accepting or rejecting the cookies is *not* required to interact with the site.

134. *Second*, when the user clicks on "Customize Cookies" the cookie banner expands to show several categories. Notably, "necessary cookies" cannot be toggled off on the user's browser. Included in the list of "necessary" cookies is the NID cookie, which is set by Google for "advertising purposes."

135. Indeed, in implementing the NID cookie as "necessary," AAC effectively admits that regardless of whether the user opts out to cookies, Google is still intercepting the user's

[24] Privacy Policy, https://americanaddictioncenters.org/privacy-policy (last visited September 4, 2026)

[25] Id.

confidential health communications and protected health information, in violation of HIPAA and the CFR.

136. Notably, HHS issued guidance which explicitly states that: "Website banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do not constitute a valid HIPAA authorization."[26]

137. Moreover, as detailed above, cookies are not the only manner in which a users' confidential communications with Defendant are intercepted by third party tracking technologies like Google. Therefore, the existence of this banner is insufficient to obtain the user's consent to Tracking Tools as a whole.

**K. Plaintiff R.L.'s Experience**

138. Plaintiff is a patient of AAC who has used the Website in connection with his substance abuse treatment. He most recently used the website in August 2026.

139. More specifically, Plaintiff used the Website to complete the following tasks: (1) schedule appointments; (2) fill out forms; and (3) request information.

140. In doing so, he communicated his PHI, including his name and date of birth, along with the fact that he was seeking substance abuse treatment and rehabilitation services.

141. Plaintiff has and had objectively reasonable expectations of privacy in communications with the AAC Website that are grounded in his status as a Website user seeking information and services from Defendant, Defendant's legal obligation to maintain the confidentiality of communications with users, and state and federal laws protecting the

[26] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited August 11, 2026).

confidentiality of user communications and medical information as described in the manner herein.

142. Yet, Defendant breached these obligations. As a result of using the Website in the manner described above, and pursuant to the systematic process described herein, Google obtained Plaintiff's Private Information. The specific information that Google received included, at a minimum, the fact that he was using the Website to schedule appointments, fill out forms, and request information. Based on the information transmitted and the identifiers described above, Google could associate Plaintiff's Website activity with him.

143. Plaintiff was logged into his Google/Gmail account while using Defendant's Website.

144. Pursuant to the systematic process described herein, Plaintiff's Private Information was disclosed to Google; this data included his PII, PHI, and related confidential information. Specifically, Plaintiff communicated his name, date of birth, personal information, health-related information, and appointment requests and requests for information through Defendant's Website. This information is "content" as defined by the privacy statutes herein and is not merely information that is generated in the course of communication, nor is it simply information disclosed in the referrer header. The mere fact that the Tracking Tools are designed to capture this information and that Google values the information to gain insight into intimate details about the Website users' and patients' health confirms that the Private Information is content that conveys substance and meaning to Defendant and third parties Google.

145. As such, Defendant's procurement and use of the Tracking Tools to intercept and share Plaintiff's Private Information is a wiretap in violation of common law, federal law, and

Florida statutes, as Defendant aided and abetted Google in wiretapping and/or eavesdropping on Plaintiff's and Class Members' electronic communications with the AAC Website.

146. Plaintiff and Class members had no idea that Defendant was sharing their Private Information when they interacted with the AAC Website because the Tracking Tools are seamlessly incorporated into the background of the Website and are invisible when viewing the Website.

147. For instance, when Plaintiff used the Website in the manner described above, there was no indication that the Google Analytics code was embedded or that it would track and collect his sensitive health information. Indeed, Defendant never disclosed its use of Google Analytics, Google Ads, Google Tag Manager, or other Google Tracking tools, or that it would be disclosing Plaintiff and Class Members' Private Information to Google.

148. The disclosure of Plaintiff's sensitive healthcare information, particularly information that he otherwise kept private, has caused Plaintiff significant injury.

149. After using the Website, Plaintiff noticed targeted advertisements about Defendant.

150. This wanton disclosure of such personal information would be highly offensive to the typical person, as it is to Plaintiff.

**L. Class Wide Injuries, Damages, and Remedies**

151. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

152. Consequently, Plaintiff individually and on behalf of the putative Class, brings this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiff and the putative Class have suffered significant damages and seek the following remedies:

a. Compensatory damages;

b. Loss of benefit of the bargain;

c. Conversion (FMV value of the use of the data for marketing);

d. Statutory damages;

e. Nominal damages, in the alternative;

f. Consequential and future damages for reasonable and necessary data monitoring services including data broker and dark web monitoring, as well as the cost of removing the disclosed data and profiles from data broker networks;

g. Restitution for the FMV of the misuse of the Private Information;

h. Disgorgement of profits or cost savings derived from misuse of Plaintiff's and Class Members' Private Information;

i. Injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

153. The injunctive relief sought includes:

a. Removal of the Tracking Tools from sensitive parts of the Website;

b. Deletion of all analytics data collected through the Tracking Tools that includes Private Information;

c. Deletion of all audience profiles and campaigns built from data gathered through the Tracking Tools and from Plaintiffs' and Class Members' Private Information;

d. Deletion of Plaintiff's and Class Member data from all identifiable third-party broker lists;

e. Enjoining Defendant from utilizing any of the Tracking Tools at issue in this matter in the future on any sensitive Website pages.

f. Enjoining Defendant from utilizing any other Tracking Technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with third parties.

Other relief as ordered by the Court.

## TOLLING

154. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) his Private Information was intercepted and unlawfully disclosed to third parties in the manner described herein because Defendant kept this information secret, and the Tracking Tools were invisible when he used the Website.

## CLASS ACTION ALLEGATIONS

155. Plaintiff brings these claims on behalf of himself, individually, and on behalf of the following classes:

> **Nationwide Class:** All natural persons in the United States who used the Website, and whose Private Information was disclosed or transmitted to Google, or any other unauthorized third party via the Tracking Tools.

> **Florida Subclass:** All natural persons residing in Florida who used the Website, and whose Private Information was disclosed or transmitted to Google, or any other unauthorized third party via the Tracking Tools.

156. Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

157. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment or preliminary approval of a settlement.

158. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

159. This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure Section 23.

160. Numerosity: The Classes are so numerous that joinder of all Class Members is impracticable. Given the volume of Defendant's business, there are thousands, if not hundreds of thousands, of Class Members. The identities of Defendant's patients and Website visitors may be obtained from Defendant and the third parties to whom Defendant disclosed their information.

161. Commonality: This case presents common questions of law and fact, including but not limited to:

(a) Whether Defendant intentionally tapped the lines of Internet communication between patients and their medical providers;

(b) Whether Defendant's Website surreptitiously track personally identifiable information, protected health information, and related communications and simultaneously discloses that information to Google;

(c) Whether Google is a third-party eavesdropper;

(d) Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constitute an affirmative act of communication;

(e) Whether Defendant's conduct, which allowed third parties to view Plaintiff's and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

(f) Whether Defendant's conduct, which allowed third parties to view Plaintiff's and Class Members' personally identifiable information and protected health information, resulted in a breach of confidence;

(g) Whether Defendant violated Plaintiff's and Class Members' privacy rights by using Tracking Technologies to communicate online patients' Private Information to third parties;

(h) Whether Plaintiff and Class Members are entitled to damages under ECPA or any other relevant statute;

(i) Whether Defendant's actions violated Plaintiff's and Class Members' privacy rights;

162. Typicality: Plaintiff's claims are typical of the claims of the Class because Plaintiff used Defendant's Website and had his personally identifiable information and protected health information disclosed to third parties such as Google without his express written authorization or

knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

163. Adequacy. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

164. Questions of law and fact common to the Classes Predominate over any questions affecting only individual members of the classes, and a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of ECPA and FSCA. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

165. Defendant has acted or refused to act on grounds that generally apply to Classes such that final injunctive relief is appropriate respecting the Classes as a whole.

166. In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate actions.

167. Yet, the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will be only a small fraction of the ultimate recovery to be achieved.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA") 18 U.S.C. § 2511(1) *et seq.* UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE
**(On Behalf of Plaintiffs and the Nationwide Class)**

168. Plaintiff repeats the allegations contained in paragraphs 1-167 as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

169. The ECPA protects both sending and receipt of communications.

170. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

171. The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

172. The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

173. **Electronic Communications.** The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

174. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

175. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

176. **Electronic, Mechanical, or Other Device.** The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's webservers; and

d. The Tracking Tools deployed by Defendant to effectuate the sending and acquisition of patient communications.

177. By utilizing and embedding the Tracking Tools on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

178. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to Google.

179. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, appointments, and scheduling.

180. By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

181. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

182. **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

183. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used Tracking Tools and Conversions API to track and utilize Plaintiffs' and Class Members' Private Information for financial gain.

184. Defendant was not acting under color of law to intercept Plaintiff and the Class Member's wire or electronic communication.

185. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Tracking Tools code. Any purported consent that Defendant received from Plaintiff and Class Members was not valid. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious and designed to violate federal and state legal provisions, including as described above a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE FLORIDA SECURITY COMMUNICATIONS ACT**
**(On Behalf of Plaintiffs and the Florida Subclass)**

186. Plaintiff repeats the allegations contained in paragraphs 1-167 as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Subclass.

187. The Florida Secretary of Communications Act ("FSCA") is codified at Florida Statutes, § 934.01, *et seq*. The FSCA begins with legislative findings, including:

> On the basis of its own investigations and of published studies, the Legislature makes the following findings…(4) to safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court.

188. Florida Statutes § 934.10 provides, in pertinent part, as follows:

> Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,0000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

189. The FCSA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

190. At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook to intercept Plaintiff's and Class Members' Internet communications while accessing Defendant's Website, including the contents thereof—*i.e.*, the URL visited, the medical conditions and treatment searched, and the contents of any live chats. Such information not only constitutes protected health information; it also represents the substance, import, and meaning of the communications between Plaintiff and other Florida Subclass Members had with Defendant's Website.

191. As medical and substance abuse disorder patients, Plaintiff and other Class Members had a reasonable expectation of privacy in the electronic communications they had with Defendant's Website.

192. Nonetheless, these electronic communications were transmitted to and intercepted by a third party (i.e., Google) during the communication and without knowledge, authorization, or consent of Plaintiff and Class Members. That is because Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff and Class Members, recorded and transmitted the substance of their confidential communications with Defendant to a third party.

193. Defendant willingly facilitated Google's interception and collection of Plaintiff's and Class Members' Private Information by embedding the Tracking Tools on its Website.

194. Defendant used the following items as a device or apparatus to intercept wire, electronic, or oral communications made by Plaintiff and other Class Members:

(a) The computer codes and programs Google used to track Plaintiff's and Class Members' communications while they were navigating Defendant's Website.

(b) Plaintiff's and Class Members' browsers;

(c) Plaintiff's and Class Members' computing and mobile devices;

(d) Facebook's web and ad servers;

(e) The web and ad-servers from which Google tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate Defendant's Website

(f) The computer codes and programs used by Google to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's website; and

(g) The plan Google carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit Defendant's website.

195. Defendant fails to disclose that it is using the Google Tracking Tools and associated programs specifically to track and automatically and simultaneously transmit communications to a third party, i.e., Google.

196. To avoid liability under the FCSA, a defendant must show it had the consent of *all* parties to a communication.

197. The patient communication information that Defendant transmits while using the Google's Tracking Tools, such as names, treatment information, booking information, insurance verification, IP addresses, and home addresses constitutes protected health information.

198. As demonstrated herein above, Defendant violates the FCSA by aiding and permitting third parties to receive its patients' online communications in real time through its Website without their consent.

199. By disclosing Plaintiff's and Class Members' Private Information, Defendant violated Plaintiff's and Class Members' statutorily protected privacy rights.

200. As a result of the above violations and pursuant to Florida Statutes, § 934.10, Plaintiff and Class Members are entitled to actual damages or liquidated damages of $1,000 or $100 per day for each violation, whichever is higher.

201. Under the statute, Defendant is also liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## THIRD CAUSE OF ACTION
**Common Law Invasion of Privacy - Intrusion Upon Seclusion.**
**(On Behalf of Plaintiff and the Nationwide Class)**

202. Plaintiffs repeat the allegations contained in paragraphs 1-167 as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

203. Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website.

204. Plaintiff and Class Members communicated sensitive and protected medical information and individually identifiable information that they intended for only Defendant to receive and which they understood Defendant would keep private as their health care provider.

205. Defendant's disclosure of the substance and nature of Plaintiff's and Class Members' communications to third parties without their knowledge and consent is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

206. Plaintiff and Class Members had a reasonable expectation that their communications, identity, health information and other data would remain confidential, and that Defendant would not install wiretaps on its Website to secretly transmit their communications to unauthorized third parties.

207. Defendant was authorized to receive Plaintiff's and Class Members' Private Information from their respective web browsers when they used the Online Platforms, but it was not authorized to force Plaintiff's and Class Members' web browsers to transmit information to Google and other unauthorized third parties without their consent or authorization.

208. Defendant therefore obtained Plaintiff's and Class Members' Private Information under false pretenses and/or exceeded its authority to obtain the Private Information.

209. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

210. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

211. Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests because of its intrusions upon Plaintiff's and Class Members' privacy.

212. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

213. Plaintiff also seeks such other relief as the Court may deem just and proper.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE**
**(On behalf of Plaintiffs and the Nationwide Class)**

214. Plaintiff repeats the allegations contained in paragraphs 1-167 as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

215. Defendant owed Plaintiff and Class Members a Duty to keep their private information completely, confidential and to safeguard sensitive personal and medical information.

216. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's website.

217. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

218. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

219. The third-party recipients included, but may not be limited to, Google.

220. As direct and proximate cause of Defendant's unauthorized disclosure of patient, personally identifiable, non-public medical information, and communications. Plaintiff and Class members were by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a Jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

221. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

**FIFTH CAUSE OF ACTION**
**Common Law– Breach of Confidence**
**(On Behalf of Plaintiff and the Nationwide Class)**

222. Plaintiff repeats the allegations contained in paragraphs 1-167 as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

223. Plaintiff and Class Members disclosed in confidence their health and private information with Defendant through the Defendant's Website.

224. Plaintiff and Class Members have an interest in keeping their protected private and medical information in confidence with their health services provider, the Defendant.

225. The information disclosed in confidence is protected health and private information the Defendant had knowledge was confidential due to Federal and State laws that protect such information (e.g., HIPAA, ECPA, FSCA and CFR).

226. Plaintiff and Class Members had an expectation that the confidential information disclosed to Defendant would be kept in confidence with Defendant due to their relationship with Defendant as a health services provider and Federal and State laws that protect such information (e.g., HIPAA, ECPA, and FSCA).

227. Plaintiff and Class Members had an expectation that the confidential information disclosed to Defendant would be kept in confidence with Defendant due to their relationship with Defendant as a substance abuse disorder treatment facility and Federal and State laws that protect such information (e.g., HIPAA, FSCA, ECPA, and CFR).

228. Defendant violated its duty to protect the confidentiality of Plaintiff's and Class Members' information by using the Google Tracking Tools to communicate patients' identifiers

and other individually identifying information alongside their confidential medical communications with Google.

229. Defendant disclosed Plaintiff's and Class Members' confidential information for Defendant's own economic benefit in Defendant's own business and disclosing it without Plaintiff's and Class Members' consent.

230. Defendant disclosed and disseminated Plaintiff's and Class Members' confidential communications to a broad audience including Google.

231. At no time did Defendant offer to purchase or financially compensate Plaintiff and Class Members for the use of their confidential information for Defendant's advertisement purposes.

232. As a result of Defendant's actions, Plaintiff and Class Members suffered harm and injury, including but not limited to a breach of their confidence, were damaged as a direct and proximate result of Defendant's breach, and are entitled to just compensation, including monetary damages.

233. Plaintiff also seeks such other relief as the Court may deem just and proper.

**SIXTH CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class)**

234. Plaintiff repeats the allegations contained in paragraphs 1-167 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

235. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiff and the Class Members provided their Private Information.

236. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information or use it for non-medical purposes without consent.

237. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to maintain the confidentiality and limited scope of use.

238. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to the unauthorized third-party marketers without consent.

239. Defendant further breached the implied contracts by using Plaintiff's and Class Members' Private Information without consent.

240. As a direct and proximate result of Defendant's breach of these implied contracts, Plaintiff and Class Members sustained numerous injuries including but not limited to the loss of the benefit of their bargain, invasion of privacy, loss of control of their Private Information, misappropriation and misuse of their Private Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

241. Consequently, Plaintiff, individually and on behalf of the nationwide putative Class seeks legal and equitable remedies to address and rectify the breach of implied contract described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and, in the alternative, nominal damages. Plaintiffs further seeks restitution, and disgorgement of profits or cost savings obtained from breach and the improper use of the Private Information. Finally, Plaintiffs seeks injunctive

relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

**SEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

242. Plaintiff repeats the allegations contained in paragraphs 1-167 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

243. Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

244. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

245. Defendant exceeded any authorization given and instead consciously disclosed, misappropriated, and misused the Private Information for marketing and its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary savings and revenue.

246. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members for the use of the Private Information.

247. The financial benefits that Defendant derived from Plaintiff and Class Members were not offered by Plaintiffs and Class Members gratuitously and rightly belong to Plaintiff and Class Members. It would be against equity and good conscience for Defendant to be permitted to

retain any of the savings, profit or other financial benefits wrongly derived from the misappropriation and misuse of Plaintiff's and Class Members' Private Information as alleged in this Complaint.

248. Consequently, due to the unjust nature of Defendant's actions and the injuries and damages sustained by Plaintiff and the Class, Defendant should be compelled to disgorge into a common fund all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper. These equitable funds can be evenly allocated among the Plaintiff and Class Members on a pro-rata basis.

249. Alternatively, Defendant should be compelled to provide restitution to Plaintiff and Class for the fair market value of the Private Information that Defendant misappropriated and misused for marketing purposes without consent.

250. Further, Plaintiff seeks injunctive relief to prevent the imminent financial and privacy harms arising from the ongoing disclosure, interception, and misuse of Plaintiffs' and Class Members' Private Information.

**RELIEF REQUESTED**

Plaintiff, on behalf of himself and the proposed Class, respectfully requests that the Court grant the following relief:

(a) Certification of this action as a class action and appointment of Plaintiff and Plaintiff's counsel to represent the Class;

(b) A declaratory judgement that Defendant violated: (1) the ECPA; (2) the FSCA; (3) Plaintiff's and Class Members' privacy rights as provided at common law; and (4) Plaintiff's and Class Members' other rights under common law;

(c) An order enjoining Defendant from engaging in the unlawful practices and illegal acts described therein; and

(d) An order awarding Plaintiff and the Class: (1) actual or statutory damages; (2) punitive damages—as warranted—in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper; (5) pre-judgment and post-judgment interest as provided by law; and (6) such other and further relief as the Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury for all the claims asserted in this Complaint so triable.

Dated: September 21, 2026 By: */s/ David Hilton Wise*

David Hilton Wise, Esq. (NV S.B. #11014)
**WISE LAW FIRM, PLC**
335 W. 1st Street
Reno, NV 89503
Telephone: (775) 299-4284
Email: dwise@wiselaw.pro

Alexandra M. Honeycutt*
**MILBERG PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
ahoneycutt@milberg.com

Alexandra Mormile*
**SHAMIS GENTILE, P.A.**
14 NE 1st Ave Suite 705
Miami, FL 33132
Tel: 305.479.2299
E: amormile@shamisgentile.com

**** pro hac vice forthcoming***

***Counsel for Plaintiff and the Putative Class***